# IN THE COURT OF APPEALS OF IOWA

No. 20-0219
Filed May 13, 2020

**IN THE INTEREST OF R.R.,**
**Minor Child,**

**T.R., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Appanoose County, William Owens, Associate Juvenile Judge.

A father appeals the termination of his parental rights to a child. **AFFIRMED.**

Kevin S. Maughan, Albia, for appellant father.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Debra A. George of Griffing & George Law Firm, PLC, Centerville, attorney and guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., Greer, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**MAHAN, Senior Judge.**

A father appeals the termination of his parental rights to a child, born in 2018.[1]  He contends the State failed to prove the grounds for termination cited by the juvenile court and termination was not in the child's best interests.  We affirm.

## I.  *Background Facts and Proceedings*

This family most recently came to the attention of the department of human services in May 2017,[2] due to concerns the parents were using methamphetamine.  The children in the home at that time were adjudicated in need of assistance and removed from the parents' care.  The parental rights to these children have since been terminated: the father's parental rights to A.R., born in 2004, were terminated in November 2018; the father's parental rights to P.R., born in 2011, and T.R., born in 2014, were terminated in May 2019; and the mother's parental rights to S.B. (who has a different father), born in 2016, were terminated in May 2019.

In August 2018, the mother gave birth to R.R., who tested positive for methamphetamine.  Testing of R.R. determined the mother had used methamphetamine within 48 to 72 hours of delivering the child.  R.R. was adjudicated in need of assistance and placed in foster care with the same family as his half-brother, S.B., where he has remained since.

The father was in prison at the time of R.R.'s birth.  The father maintained he did not know the mother was pregnant, even though he lived with her until his

---

[1] The mother's parental rights were also terminated.  She does not appeal.
[2] The parents have a history of methamphetamine use and the department's involvement with their children.

arrest in July 2018, at which time she was eight months pregnant.[3]  The father declined visits until paternity testing confirmed him to be R.R.'s father.  Thereafter, he had a few visits with R.R. while he was in prison.  When the father was released from prison in March 2019, he was scheduled to have one two-hour supervised visit each week, which he attended sporadically from March to July.  Numerous services were offered to the father, including substance-abuse evaluations; medication management; family safety, risk, and permanency (FSRP) services; safety plans; family team meetings; transportation assistance; individual therapy; family treatment court; and a parent partner.

Meanwhile, in June 2019, the State filed a petition to terminate the parental rights of the parents.  The termination hearing began on July 17, 2019.  The father was not present.  The department caseworker testified, the father "has had since March of 2015 to make the changes he needed to make, and [he did not] stop[] using until [he was] incarcerated."  The caseworker stated the father "now is not incarcerated and is not making [his child] a priority again."  The caseworker acknowledged that FSRP providers had recently observed the father having "positive visits" with R.R. and "actively parent[ing] during visitation," but the father had only "spent a total of 12 hours and 25 minutes with" R.R.

The caseworker noted the father had made improvements in other areas. He was living with his girlfriend, although the home had not yet been evaluated for visitation.  He was employed, he had completed a substance-abuse evaluation and substance-abuse treatment, and he had participated in random drug testing with

---

[3] Caseworkers expressed doubt regarding the father's claim that he did not know the mother was pregnant.

no positive test results. He had also participated, albeit not consistently, in mental-health treatment. The caseworker explained that mental-health treatment was necessary for the father to be able to provide a safe placement for R.R. because the father, "himself, over the last however many years I have been working with him—four years—has acknowledged that he has depression, that he has mental health issues, that when he gets down and depressed and feels worthless, that impacts his use." The caseworker believed "if he doesn't address the underlying things that lead to his use, it is unlikely he will stay sober long term."

The caseworker further testified that it was necessary for the father "to demonstrate that he can meet [R.R.]'s special needs." R.R. has several significant medical conditions, including neurological and muscular issues and a history of seizures, which require care from a variety of medical providers. The caseworker testified the father was able to "play . . . and have fun with [R.R.], but [he] cannot parent him 24/7."

The court decided to continue the termination hearing to "afford[] [the mother] an opportunity to continue to build on this success [she's] had at this point." The court stated, "It also, . . . by default gives [the father] an opportunity to figure out what the heck he is doing. . . . Perhaps rearranging his priorities to make [R.R.] his first priority, or at least making room for him in his life."

The termination hearing continued on January 9, 2020.[4] The mother was not present; she had fled from a halfway-house facility and a warrant was pending for her arrest. The father was present. He had been employed "since May or

---

[4] The court also held review hearings in September and October.

June," had "stable housing" with his now-fiancé, and had remained sober. Since September, the father had been having visits twice weekly at his home, which had progressed to include one overnight visit each week. The father testified he was prepared to have the child placed in his home. He testified maintaining sobriety was an "easy decision" because "I know if I go back down that way, I'm losing everything that I've built, worked so hard to get." The father acknowledged that R.R. was bonded to his foster parents and S.B., but he stated, "[B]eing his biological dad, I feel like I should have a chance to have a relationship with my son, to show that I can take care of my son. I've never had that chance."

The father had been tasked with scheduling the child's physical therapy appointments, which he did only a few times. The father was also tasked with scheduling the child's area education agency appointments, but since October 31, the father had only scheduled one of the child's twenty appointments. The foster parents had scheduled and attended the child's many appointments. The child's medical providers were concerned that "based on all of the medical needs that he has and physical needs that he has, if [R.R.] isn't [going to all his appointments consistently], he's not going to make progress" and "it will impact his walking, his running." The father testified he would be able to meet R.R.'s medical needs in the future: "I would take the initiative, and I would set them appointments up based on the information that I received and according to the timetable." He acknowledged he had not made those arrangements for R.R. in the past. When asked if those difficulties would continue if R.R. was placed in his care, the father

stated, "[A]fter today, no.[5] Because all my issues with attending physical therapy or any appointment, really, has been transportation. Now that I have my own transportation, I can get to anywhere I want to go." The father also testified he had not been able to take off work for appointments, "There's no working with the employer. It's work or don't work." But he believed he could plan the appointments around his work schedule.

By that time, R.R. had been removed from his parents' care for "[a] little over 16 months" and he had never been in the father's care for longer than one night. The caseworker noted "this is a difficult decision, because [R.R.] is building a relationship with [the father], and [the father] has made a lot of really good progress." But the caseworker stated the father "still wasn't having consistent visits with [R.R.] until after the September [2019] hearing," and the "only difference" she "could find was that we moved the visits to [the father's] home," "[w]e brought [R.R.] to him," and the father "wasn't being inconvenienced."

The caseworker testified if the case stayed "open," the father would need continuous monitoring to ensure that he followed up with R.R.'s medical needs, which she opined was a "concern that's well-documented based on what he's demonstrated." The caseworker also believed it would be "very traumatic" for R.R. to take him away from his foster parents and S.B. and the only home he had ever known. Despite finding the father had "shown some progress," the department "continue[d] to recommend termination of parental rights." The guardian ad litem also recommended termination of parental rights.

---

[5] The father testified that he had gotten a driver's license the day before the January termination hearing.

Following the termination hearing, the court entered its order terminating the father's parental rights pursuant to Iowa Code section 232.116(1)(g) and (h) (2019). The father appeals.

## II. Standard of Review

Appellate review of termination-of-parental-rights proceedings is de novo. *In re L.T.*, 924 N.W.2d 521, 526 (Iowa 2019). Our primary consideration is the best interests of the child, *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006), the defining elements of which are the child's safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

## III. Discussion

The father challenges the sufficiency of the evidence supporting the grounds for termination cited by the juvenile court. We may affirm if we find clear and convincing evidence to support any of the statutory provisions. *See In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). We will focus on Iowa Code section 232.116(1)(h), which requires proof of several elements including proof R.R. could not be placed in the father's custody.

The father claims, "There have been absolutely no safety concerns or parent skill concerns expressed about [his] visitation with and parenting of the child." He contends the "real issue" is his "ability to take care of R.R.'s special needs." According to the father, "Most of the medical and physical therapy appointments were made by others without consulting [him] as to his work schedule and availability." The father also points to his "lack of transportation" as a difficulty for him, "which has been resolved." In sum, the father claims the child

can be returned to his care and "[t]he concerns expressed can be addressed with R.R. in [his] home without removal."

At the time of the termination hearing, the child had been removed from the parents' care since birth. The father was in prison until March 2019 and did not begin any sort of meaningful visitation with the child until September. We commend the father's progress to maintain employment, housing, and sobriety since his release from prison, but we concur in the department's opinion that the father's actions during this proceeding evince his motivations were more about staying out of jail than taking on a parenting role for the child. The father was aware the child's medical needs were a significant concern but, when given the time and opportunity to show he could perform the necessary tasks, the father failed to do so consistently and without direction. As the juvenile court found:

> [R.R.] was removed from parents' care and custody on August 30, 2018, and has never resided in the home of either of his parents. [R.R.] has numerous special needs that require more attention and diligence than either of these parents are capable of addressing on a consistent basis. [The parents] were given an opportunity to schedule and attend some of those appointments, but neither was able to consistently fulfill the department's expectations. . . . [The father] has made some progress, but his history and the aforementioned termination proceedings involving his other children do not bode well for his long-term improvement and recovery. [The father's] progress is simply too little too late. Based on the record there is no possibility [R.R.] could be returned to the custody of either parent today and be protected from the type of harm that gave rise to [his] removal and subsequent adjudication.

We concur in the court's finding. Although this is a close case, we find there is sufficient proof the father remains unable to provide for the child's needs on a consistent, long-term basis. *See In re Z.H.*, 740 N.W.2d 648, 651–52 (Iowa Ct. App. 2007) ("Parenting cannot be turned off and on like a spigot. It must be

constant, responsible, and reliable." (quoting *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990))).  Iowa Code section 232.116(1)(h) was satisfied.

We turn to the child's best interests.  The father points us to the supreme court's acknowledgment that "[t]he best-interest-of-the-child framework has backward-looking and forward-looking components."  *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020).  We too observe that

> [c]entral to a determination of this nature are the best interests of the child.  In this connection, we look to the child's long-range as well as immediate interests.  Hence we necessarily consider what the future likely holds for the child if returned to his or her parents.  Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing.

*In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981) (citations omitted); *accord B.H.A.*, 938 N.W.2d at 232.  On this question, the juvenile court found:

> [The parents] both have a long history of substance use and abuse which has led them to engage in criminal conduct resulting in stays in jail, residential facilities, and prison.  That conduct has resulted in prior termination proceedings involving multiple children. . . .  [The father] has made progress since his release from prison, but his history of focusing on his own issues (job, health, criminal conduct) resurfaced when he was asked to take a more active role in tending to [R.R.]'s special needs. . . .  The parents' history of substance use and instability must also be examined in light of [R.R.]'s very special needs.  [R.R.]'s medical, educational and developmental needs will require constant monitoring and attention.  [The parents] were given an opportunity to take more responsibility for those issues, but neither showed the capacity to address those issues in a way that gives the court confidence that they could do so into the future.

Although "there exists a parental interest in the integrity of the family unit," "this interest is not absolute, but rather may be forfeited by certain parental conduct."  *Dameron*, 306 N.W.2d at 745.  R.R. is in need of and deserves permanency.  We conclude it is in R.R.'s best interest for termination of parental

rights to occur. No permissive statutory exception should be applied to preclude termination. We affirm the decision of the juvenile court to terminate the father's parental rights.

**AFFIRMED.**